## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 25-cr-138-RJL** |
| **v.** | : | |
| | : | |
| **DREMALE VANTEPROOL,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT VANTERPOOL'S
## MOTION TO SUPPRESS TANGIBLE EVIDENCE

The United States files this opposition to Defendant Dremale Vanterpool's motion to suppress evidence obtained from the search of his person.  ECF No. 36.  Defendant's motion should be denied, because there was probable cause to arrest Vanterpool at the time he was seized which provided a legal basis to then conduct a search incident to arrest.  Contrary to Defendant's assertions, there is no Fourth Amendment violation, and the motion to suppress evidence should be denied.

### I.    FACTUAL BACKGROUND

At approximately 2:50 p.m., on June 7, 2023, U.S. Capitol Police (USCP) were alerted to a license plate hit for a grey Nissan Rogue bearing North Carolina registration JLL-1621, traveling Southbound on the 800 block of North Capitol Street NW in Washington, D.C.  USCP Officers Raymond Mooney and K. Dias, who were in a patrol vehicle, responded to the area to canvass and observed a vehicle with matching make, model, color, and license plate in the 600 block of H Street NE, Washington, D.C.  Officer Mooney conducted a WALES/NCIC check via USCP radio, which confirmed the vehicle was wanted in connection with recent armed robberies in Delaware and Maryland.  Around that time, Officer Sean Wagner—who was in full uniform and operating a USCP motorcycle—got behind Officer Mooney and Dias' vehicle.

Officer Dias, the driver, activated the vehicle's emergency lights and sirens to conduct a traffic stop in the 1300 block of H Street NE, Washington, D.C.  The Nissan Rogue pulled to the right, slowing but not stopping completely, and then abruptly pulled from the curb and accelerated quickly, disobeying the officer's clear commands to pull over.   Officers Dias/Mooney (in a patrol car) and Officer Wagner (on his motorcycle) pursued the vehicle, which weaved in and out of traffic and crossed the double yellow line multiple times, committing multiple traffic violations. They pursued the vehicle until 3408 Ely Place SE, where the Nissan Rogue got stopped in traffic congestion.  *See* Image 1 below.



*Image 1:  USCP photo of the Nissan Rogue with North Carolina license plate JLL-1621
on the corner of Ely Place and Anacostia Road SE*

At this time, both the driver (later identified as defendant Dremale Vanterpool), who was wearing a grey hoodie and dark jeans, and the front passenger (later identified as defendant Torrance Brock), who was wearing a black hoodie and blue jeans, exited the vehicle and fled on

foot westbound in the 3400 block of Ely Place.  They entered the alley on the North curb of the

block, continued fleeing through the alley, and exited out to the 3400 block of Minnesota Avenue

SE.   Both Officer Mooney and Wagner observed both Vanterpool and Brock holding their

waistbands, consistent with concealing a weighted object—an indication of being armed.  Officer

Wagner also observed at least one of the two subjects lose a hat while fleeing.  The pair continued

fleeing northbound in the 3400 block of Minnesota Avenue SE until entering the driveway on the

east curb of 3459 Minnesota Avenue SE.  *See* Image 2.



*Image 2: Crime scene photo showing the driveway (left) of 3459 Minnesota Avenue SE (off-frame, left) separated by a wood fence from the backyard of 3455 Minnesota Avenue (right)*

While pursuing the pair down the driveway, Officer Mooney observed Vanterpool toss a

white baseball-size object over an adjacent fence into the rear yard of 3455 Minnesota Avenue

SE.[1]  Vanterpool then lost his footing, and Officer Mooney took him into custody.  At this time, Officer Mooney observed that Brock was close to the same fence positioned in a shotput-style stance, consistent with having just thrown something.

Officer Wagner continued to chase Brock into the back of 3459 Minnesota Avenue.[2] Officer Wagner drew and pointed his service firearm at Brock.  Around that same time, Officer Dias converged on Brock from the other side of the building.  Brock then laid on the ground, and the officers placed him in handcuffs.

Officer Mooney then patted Vanterpool down for weapons, and waited for other officers to arrive.  After backup arrived, he searched Vanterpool incident to arrest. That search revealed a digital scale from Vanterpool's left front pocket, $605 in U.S. Currency from his right front pocket, two cellular devices, and a clear bag containing a purple powdery substance.  *See* Image 3, 4.  Lab testing would later identify fentanyl and cocaine in the purple powder.[3]

 

*Image 3 (top left): Two phones and $605 in cash recovered from Vanterpool*
*Image 4 (top right): Scale and purple powder containing fentanyl and cocaine recovered from Vanterpool*

---

[1] Officer Wagner described it as an unknown object.
[2] Though this motion pertains solely to Vanterpool, these facts are included for the Court's awareness.
[3] Brock was also searched and police recovered a black phone and a black ski mask.

Meanwhile, another officer took custody of Brock and Officer Wagner went back to the Nissan Rogue, by which time MPD had arrived to secure it.

In the driveway, Officer Mooney looked next door, where he identified in the yard of 3455 Minnesota Avenue SE a baseball-sized clear plastic bag containing a white rock like substance and a white powdery substance consistent with the one Vanterpool threw.  *See* Image 5 (later crime scene photo).  The substances would later be field tested off-site which resulted in positive test for cocaine and cocaine base.



*Image 5: Photo showing the baseball-sized clear plastic bag (red circle) in the yard of 3455 Minnesota Avenue SE consistent with the one Vanterpool was observed throwing*

Officer Wagner and Mooney then canvassed the pair's flight path and located a New York Yankees hat and a firearm (Springfield Armory Hellcat) in the yard adjacent to 3423 Minnesota

Avenue SE.[4]   *See* Image 6. The gun was loaded with one 9mm round in the chamber and a full

13-round magazine.   A cellphone was also recovered nearby.



*Image 6: Close-up photo of the Springfield Armory Hellcat recovered from the yard adjacent to 3423 Minnesota Avenue SE*

Vanterpool and Brock were transported off scene for medical attention and later processed

at the station.   After their arrests, USCP conducted database checks which revealed that the

defendants did not have valid permits to carry the firearm in DC, and that both had prior felony

convictions.

Later that evening at about 7:43 p.m., in response to a tip, police responded to the backyard

of 3453 Minnesota Avenue SE (two houses over from the driveway at 3459 Minnesota Avenue)

---

[4] Officer Mooney and Wagner's recollections differ on the ordering and whether both were present.

and recovered a Taurus G3C 9mm loaded with one 9mm round in the chamber with a 17-round magazine, containing fifteen 9mm rounds in the magazine well.

On June 8, 2023, pursuant to a Maryland state warrant, USCP and Ocean City police searched the Nissan Rogue.[5]  From the car, police found, among other things, a bag containing a green leafy substance in the driver's side door, and a State of North Carolina registration card indicating that the car was registered to Dremale Vanterpool in the glovebox.

## II.    LEGAL STANDARD

Under the Fourth Amendment to the Constitution, a search without a judicial warrant will be deemed reasonable only if it falls within a specific exception to the warrant requirement.  *Riley v. California*, 573 U.S. 373 (2014).  The burden is on the government to establish that the claimed exceptions apply.  *See, e.g., United States v. Johnson*, 365 F. Supp. 3d 89, 96 (D.D.C. 2019).  The propriety of a search under the Fourth Amendment depends on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not on the officer's own subjective intent in executing the search.  *See United States v. Holmes*, 385 F.3d 786, 790 (D.C. Cir. 2004) (citation omitted).

## III.    ARGUMENT

Vanterpool was not seized within the meaning of the Fourth Amendment until he was actually detained.  By that time, having fled from police in a motor vehicle based on a report that the vehicle was engaged in armed robbery and committing multiple traffic infractions in the process, running while holding something in his waistband, and throwing a white object, police had probable cause to arrest him, but at very least reasonable articulable suspicion to detain him.

---

[5] Defendant Vanterpool does not apparently challenge this search.

By the time Vanterpool's person was searched, police had probable cause to arrest him for the criminal motor vehicle chase and his possession of narcotics.

### a. __Officers did not seize the Nissan Rogue because it fled__

Contrary to Vanterpool's core argument, he was not seized when Officer Dias attempted to pull over the Nissan Rogue by engaging the patrol vehicle's lights. It is black-letter law that a person is not seized when they flee from police. "A seizure will be found if the individual at whom the show of authority is directed *submits*." *United States v. Castle*, 825 F.3d 625, 633 (D.C. Cir. 2016) (emphasis added). "[The word 'seizure'] does not remotely apply, however, to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee. That is no seizure." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). Here, the Nissan Rogue slowed—but did not reach a complete stop—upon Officer Dias' activation of the patrol vehicle's lights and sirens. It then sped off and led police on a chase through the streets of D.C. In other words, Vanterpool and Brock did not actually submit to police authority. As the Supreme Court has explained in a case involving a 20-mile chase ending in a fatal crash, "[w]e did not even consider the possibility that a seizure could have occurred during the course of the chase because, as we explained, that 'show of authority' did not produce his stop." *Hodari D.*, 499 U.S. at 628 (citing *Brower v. Inyo County,* 489 U.S. 593, 596 (1989)).

Even if the Court did find that the Nissan Rogue stopped and was therefore seized, officers had reasonable articulable suspicion to do so. Officer may effect a brief investigative *Terry* stop if he has "a reasonable suspicion, grounded in specific and articulable facts, that a person ... was involved in or is wanted in connection with a completed felony." *United States v. Hensley,* 469 U.S. 221, 229 (1985). The "reasonable, articulable suspicion" required to justify a *Terry* stop is only "a 'minimal level of objective justification' – a standard significantly lower than the probable

cause required for a warrant." *See United States v. Goddard*, 491 F.3d 457, 460 (D.C. Cir. 2007) (per curiam) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984)).

Here, Officer Mooney and Dias received an alert for a stolen grey Nissan Rogue bearing North Carolina registration JLL-1621 traveling Southbound on North Capitol Street NW in Washington, D.C.  The officers then observed a vehicle with matching make, model, color, and license plate in the 600 block of H Street NE (less than a mile away).  *See United States v. Abdus-Price,* 518 F.3d 926, 930 (D.C. Cir. 2008) ("An MPD radio lookout implicated the occupants of a particular automobile in an armed robbery. There were several points of similarity between the car described in that lookout and the car in which Abdus–Price was traveling.").  Before commencing the stop, Officer Mooney confirmed via USCP radio the vehicle was wanted in connection with armed robberies in Delaware and Maryland.  Only then did USCP attempt to pull over the vehicle, unsuccessfully.  At that point, officers had reasonable articulable suspicion based on reliable information that the occupants of the vehicle had been involved in a crime.  *Abdus-Price*, 518 F.3d at 931 ("Based on its similarity to the car described in the armed-robbery lookout, Sergeant Hance had reasonable suspicion that the occupants of the two-toned Crown Victoria were involved in or were wanted in connection with a completed felony.") (cleaned up, citation omitted).

### b. Officers Had Probable Cause to Arrest, or At the Very Least Reasonable Articulable Suspicion to Seize, Vanterpool

By the time Officer Mooney handcuffed Vanterpool in the driveway adjacent to 3459 Minnesota Avenue, officers had probable cause to arrest Vanterpool, but at the very least reasonable articulable suspicion that he had been involved in a crime. [6]

---

[6] Vanterpool was not seized prior to this point. *Brendlin v. California*, 551 U.S. 249, 262 (2007) ("[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away.").

Officer Mooney had probable cause to arrest Vanterpool at the time he handcuffed Vanterpool. The existence of probable cause to arrest depends on "the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest," and is based on "the totality of the circumstances." *Lin v. D.C.*, No. 20-7111, 2022 WL 4007900, at *6 (D.C. Cir. Sept. 2, 2022) (citation omitted). Probable cause requires "more than bare suspicion," but "less than a preponderance of the evidence." *United States v. Burnett*, 827 F.3d 1108, 1114 (D.C. Cir. 2016). What is required is a "substantial chance of criminal activity." *Lin*, 2022 WL 4007900, at *6 (citation omitted). Regardless of the offenses of arrest, a reasonable officer in Officer Mooney's position had probable cause to arrest Vanterpool for the motor vehicle chase. *See United States v. Bookhardt*, 277 F.3d 558, 565 (D.C. Cir. 2002) ("Even if probable cause does not support arrest for the offense charged by the arresting officer, an arrest (and search incident thereto) is nonetheless valid if the same officer had probable cause to arrest the defendant for another offense."). D.C. Code § 50–2201.05b makes it a 6-month misdemeanor who someone who "knowingly fails or refuses to bring the motor vehicle to an immediate stop, or who flees or attempts to elude a law enforcement officer, following a law enforcement officer's signal to bring the motor vehicle to a stop." D.C. Code § 50–2201.05b(b)(1). And further, it is a five-year felony where the operator who commits the misdemeanor offense "so drives the motor vehicle in a manner that would constitute reckless driving under § 50-2201.04(b), or causes property damage or bodily injury." D.C. Code § 50–2201.05b(b)(2).[7] Because Vanterpool, the driver of the Nissan Rogue, had led police on an extended chase through D.C. streets– weaving in and out of traffic

---

[7] Reckless driving is "driv[ing] a motor vehicle on any highway in the District: (1) At a speed of 20 miles per hour or more in excess of the speed limit; or (2) In any other manner that displays a conscious disregard of the risk of causing property damage or bodily injury to any person." D.C. Code § 50–2201.04.

and crossed the double yellow line multiple times – there was probable cause he had committed a crime.

In the alternative, however, officers had at least reasonable articulable suspicion that Vanterpool had been involved in a crime. They knew the vehicle was reported to be involved in an armed robbery, which alone would justify the investigative stop as described above. In addition, Vanterpool and Brock fled together at high speed, in violation of D.C. law, and even abandoned their vehicle in direct response to police commands to pull over. *See also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (although "[h]eadlong flight ... is not necessarily indicative of wrongdoing, but it certainly is suggestive of such."). During their flight on foot, officers observed both Vanterpool and Brock appeared to be carrying something in their waistband, leading to officers' reasonable belief that both were armed. *See United States v. Brown,* 334 F.3d 1161, 1167 (D.C. Cir. 2003) (holding that furtive movements in response to police presence may create reasonable suspicion); *United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (holding the right side of his waistband like he was holding a gun and statement he had a gun was alone sufficient to justify *Terry* stop). Finally, right before he detained Vanterpool, Officer Mooney saw Vanterpool throw a white baseball-sized object over the fence. This confluence of factors amply supported detaining Vanterpool to investigate the suspected abandoned narcotics and potential firearm. *Edmonds*, 240 F.3d at 60 ("[E]ven though a single factor might not itself be sufficiently probative of wrongdoing to give rise to a reasonable suspicion, the combination of several factors— especially when viewed through the eyes of an experienced officer—may").

In sum, officers had at the very least reasonable suspicion to seize and investigate further, if not probable cause to arrest Vanterpool, for a crime.

11

### c.  The Warrantless Search of Vanterpool's Person Was Also Justified as a Lawful Search Incident to Arrest

The warrantless search of Vanterpool's person was justified incident to his arrest.  Police may conduct a warrantless search of an arrestee even if they have no reason to believe that the arrestee possesses weapons or evidence, so long as they had probable cause to arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973).  From Vanterpool's person, they recovered from his person a digital scale, $605 in U.S. Currency, two cellular devices, and a clear bag containing a purple powdery substance.

By the time Officer Mooney searched Vanterpool's person, he had probable cause that Vanterpool had committed a crime—engaging police in a reckless motor vehicle chase.  Thus, any subsequent search incident to arrest was justified, regardless of the officers' subjective intent.  *See United States v. Magruder*, 126 F.4th 671, 678 (D.C. Cir. 2025) (agents' subjective intent – such as their announcement that they intended to arrest defendant before search – was irrelevant).  In addition, however, Officer Mooney had also seen Vanterpool throw a white base-baseball sized object.  *See United States v. Jackson*, 360 F. Supp. 2d 24, 27 (D.D.C. 2003) ("The additional fact that Sergeant Moats observed the defendant dispose of a clear plastic bag that appeared to contain narcotics by throwing it over a fence, removes any doubt that probable cause existed to support the arrest of defendant.").  At some point during the arrest, he had confirmed that a consistent white object was in the yard next door.  *United States v. Abdul-Saboor*, 85 F.3d 664, 668 (D.C. Cir. 1996) ("[t]he relevant distinction turns not upon the moment of the arrest versus the moment of the search but upon whether the arrest and search are so separated in time or by intervening events that the latter cannot fairly be said to have been incident to the former.").  Given the circumstances, a reasonable officer in Officer Mooney's shoes had probable cause to arrest Vanterpool for narcotics violations based on the bag containing white rock and powder.  *See, e.g.,* D.C. Code §§ 48-

904.01(a)(1) (unlawful possession with intent to distribute a controlled substance). This is true notwithstanding the fact a field test was not conducted prior to the arrest. *See United States v. Prandy-Binett*, 995 F.2d 1069, 1073 (D.C. Cir. 1993) ("If Prandy–Binett's perfume bag held clear ziplock bags containing white powder, the detectives also would not have been sure whether he possessed cocaine or heroin (or some innocuous substance) [absent a field test]. Yet that cannot be a reason for finding no probable cause.").

Notably, Vanterpool does not seem to contest that the drugs and Springfield Hellcat firearm were abandoned during the police chase. ECF No. 36 at 1. Contraband that is abandoned by a person who is fleeing the police, *before* the person is seized by police, is not "the fruit of a seizure" and therefore should not be suppressed. *Hodari D.*, 499 U.S. at 629; *Brown*, 663 F.2d at 231 (police pursuit alone "does not of itself render an abandonment involuntary."). Although the D.C. Circuit has explained that it "will not treat an item as voluntarily abandoned when a person discards it due to the unlawful activities of police officers, as where the disposal was prompted by police efforts to make an illegal arrest or search," *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017), there was no illegal search or seizure before Vanterpool abandoned the firearm and narcotics. *See United States v. Williams*, No. 20-CR-00280 (TSC), 2021 WL 4521042, at *3 (D.D.C. Oct. 4, 2021) (reaching same conclusion as to abandoned firearms during flight from police).

In sum, the warrantless search of Vanterpool's person was supported as a search incident to his arrest either for evading police in a motor vehicle or for narcotics violations.

IV.    <u>**CONCLUSION**</u>

Because Vanterpool's arrest was supported by probable cause of a crime, and because the search of his person was justified incident to his arrest, defendant's motion to suppress tangible evidence (ECF No. 36) should be denied.

Respectfully,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    _/s/ Michael L. Barclay_
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
601 D Street, N.W., 5.230
Washington, D.C. 20530
(202) 252-7669
michael.barclay@usdoj.gov