**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 25-cr-138-1 (RJL)** |
| **v.** | : | |
| | : | |
| **DREMALE VANTERPOOL,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT VANTERPOOL'S MOTION TO DISMISS INDICTMENT**

The United States files this opposition to Defendant Dremale Vanterpool's motion to dismiss the indictment. ECF No. 34. Where there is no possible claim that his statutory Speedy Trial Act rights have been violated, Vanterpool's argument that this Court should reach to find a constitutional speedy trial violation is meritless. Vanterpool also does not show that the deletion of five potentially relevant body-worn cameras from the Metropolitan Police Department amounts to a violation of Due Process or Federal Rule of Criminal Procedure 16—and even if it did violate Rule 16, dismissal is a drastic and inappropriate remedy. His claim that he was vindictively prosecuted here because of his constitutional and statutory rights in Superior Court is facially meritless, but also belied by the objective selection of his case as part of the "Make DC Safe" gun initiative. Finally, this court's exercise of its supervisory authority to dismiss a federal indictment is an extraordinary remedy not warranted by these facts. For these and the reasons described below, his motion should be denied.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### a.    Vanterpool and Brock's Underlying Criminal Conduct

On June 7, 2023, defendants Vanterpool and Brock led officers on a chase both in a vehicle and then on foot, resulting in their arrest and the recovery of firearms and drugs nearby and in the flight path.  The facts underlying the criminal conduct are described at length in the complaint ECF No. 1-1.  As relevant here, however, the license plate of the Nissan Rogue Vanterpool and Brock were driving hit on a D.C. license plate reader at approximately 2:45 p.m. According to the U.S. Capitol Police CAD report, U.S. Capitol Police officers then responded to a report of stolen vehicle in the 600 Block of H Street NE at 2:50 p.m.   After the vehicle failed to come to a complete stop, U.S. Capitol officers pursued them by vehicle and on foot.  Those officers caught up with them in the driveway adjacent to 3459 Minnesota Avenue SE and had them in custody by approximately 2:57 p.m., according to the CAD report.  On information and belief, at the time of the incident, U.S. Capitol Police officers did not wear body-worn cameras ("BWC").

Officers from the Metropolitan Police Department ("MPD"), who did have BWC, responded to the scene after the initial arrest.  The available body-worn camera indicates that MPD was on scene by about 3:01 p.m., as Brock and Vanterpool were being arrested.   Law enforcement then canvassed the flight path and nearby areas for weapons and contraband.   As they were on scene, another individual—Joshua Matthews—refused to leave the active crime scene.   He was arrested at about 3:35 p.m.; officers identified that Matthews had an active Superior Court bench warrant and so transported him for processing. The Vanterpool and Brock arrests were associated with MPD CCN 23091085; the Matthews arrest was associated with MPD CCN 23091028.

Later that evening, in response to a tip, two MPD officers—Hill and Koksaldi—responded at approximately 7:41 p.m. to the back yard of 3453 Minnesota Avenue for report of a gun.   Officer

Koksaldi located a gun in the backyard (two houses over from the driveway where the defendants were arrested). U.S. Capitol Police sent a crime scene technician to document the scene.

Brock and Vanterpool's arrests were initially "no papered" due to "nexus issues."

**b. <u>The Deleted MPD Body-Worn Camera</u>**

As background, MPD officers uploading their body-worn camera footage to MPD's viewing platform, evidence.com, both "name" their video file and can "tag" the footage with an ID number—typically, that is the CCN number associated with the arrest. In this case, several MPD officers "named" their video file with the offense address—for instance, 3400 Minnesota, 3453 Minnesota, or 3459 Minnesota. Some MPD officers "tagged" their BWC with the CCN for either the Brock/Vanterpool arrest (23091085) or the Matthews arrest (23091028), and some did not tag it with any CCN at all.

In this case, the Government has produced 12 MPD body-worn camera/video files (including one transport video). The BWC generally show MPD police interacting with Vanterpool, Brock, and Matthews on scene, recorded conversations of the USCP officers involved in the footchase, and MPD's participation in the search for the discarded gun (both in the afternoon of June 7, 2023 and later that evening when responding to 3453 Minnesota Avenue). In addition to that BWC, the Government has produced around 300 crime scene photographs that document the guns, drugs, discarded items, and car; recorded interviews of the defendants; MPD and USCP paperwork (including MPD paperwork related to Matthews' case); drug and DNA reports; video evidence and reports obtained the earlier investigation in Ocean City, Maryland; and seized

evidence from four cell phones.   In total, the Government has produced well over 800 files to each defendant.[1]

However, at least five potentially relevant MPD BWC videos have been deleted.  Below is summarized data obtained from evidence.com showing tagged ID, Title, owner, upload and record dates, duration, and category for the five videos:[2]

| ID | Title | Owner | Uploaded on | Recorded on | Duration | Category |
|---|---|---|---|---|---|---|
| NA | 20230607 - 1050EX - 3400 MINNESOTA AVE NE | Johnson, Conner (12210) | 6/7/2023 22:44 | 07 Jun 2023 14:11:57 | 24m 51s | 3b. Incident, No Arrest |
| NA | 20230607-ASSIST - 3400 MINNESOTA AVENUE SOUTHEAST | Hill, Joshua (12649) | 07 Jun 2023 22:47:39 | 07 Jun 2023 15:00:26 | 33m 1s | 3b. Incident, No Arrest |
| NA | 20230607-TRAFFIC- 3900 MINNESOTA AVENUE NORTHEAST | Hill, Joshua (12649) | 07 Jun 2023 22:58:33 | 07 Jun 2023 16:21:56 | 18m 41s | 2d. Traffic Stop |
| NA | 20230607-ASSIST- 3453 MINNESOTA AVENUE SOUTHEAST | Hill, Joshua (12649) | 07 Jun 2023 23:26:30 | 07 Jun 2023 19:39:10 | 27m 0s | 3b. Incident, No Arrest |
| 20230609-ASSIST-3500 MINNESOTA AVE SE | NA | Porter, Bryan (10043) | 07 Jun 2023 22:18:59 | 07 Jun 2023 15:08:26 | 10m 42s | 3b. Incident, No Arrest |

---

[1] The Government will shortly be re-producing discovery already provided to Brock's new counsel.

[2] These five can be identified by employing time parameters around the offense date and screening the "ID" or "Title" that appear to be close to the offense location at the relevant times.

Undersigned has reviewed the audit trails for each of these five files. *See* Exhibits 1 through 5, attached. In each case, the "ID," "Title," and "Category" were all generated by the uploading officer. The retention schedule was set by the (incorrectly) tagged "category" for approximately a year from the incident date, i.e. on June 6, 2024. On June 6, 2024, the system triggered the deletion process. The deletion was completed by June 13, 2024. The files were not accessed by anyone from the U.S. Attorney's Office prior to their deletion.

The Government does not and cannot know what these five BWC would have shown. However, in order, Officer Johnson's deleted video begins at 2:11 p.m. and lasts for about 25 minutes, *i.e.* it ends at approximately 2:36 p.m.—around 14 minutes before U.S. Capitol Police even responded, according to the USCP CAD report. A clip from Officer Johnson's body-worn camera that was retained and disclosed shows him driving beginning at 2:55 p.m. and responding to the scene by 3:01 p.m., assisting the U.S. Capitol police who were already there and had arrested Brock and Vanterpool. The same BWC also captures Officer Hill at the time his first clip of deleted BWC started. Specifically, Officer Johnson's BWC shows Hill converging on Brock's arrest around the same time. *See* Images 1 and 2 below.





*Images 1 and 2: Officer Johnson's disclosed BWC shows Officer Hill (BWC deleted, red circle) converging on Brock's arrest the same time, 3:01 p.m.  Brock was already in handcuffs at this point.*

Officer Porter's deleted BWC begins around 3:08 p.m. and lasts about 11 minutes.  Porter

is depicted on Officer Wershbale's BWC looking at Vanterpool's license after a USCP officer hands

it to him, but states on body-worn camera that he was not involved in the chase and reports the vehicle was wanted for robbery out of Delaware and Maryland.  *See* Image 3.



*Images 3: Officer Wershbale's disclosed BWC shows Porter around the time of his deleted BWC.*

Officer Hill's next deleted BWC begins at 4:21 p.m.  It is not clear what it would have captured, though it is titled "20230607- TRAFFIC- 3900 MINNESOTA AVENUE NORTHEAST" (a location .7 miles away from the offense address) and category is tagged as a traffic stop.  Also, according to the USCP CAD report, both Vanterpool and Brock had been removed from the scene and one of two guns and the suspected cocaine had been recovered by that point.

Officer Hill's third deleted BWC begins around 7:39 p.m. and lasts for approximately 27 minutes, i.e. until approximately 8:06 p.m.  MPD Officer Tevfik Koksaldi's disclosed BWC begins at 7:37 p.m. and lasts until 8:03 p.m.    That video depicts Officer Koksaldi and Officer Hill responding to 3453 Minnesota.  *See* Image 4.  Officer Koksaldi—on BWC—jumps the fence by himself into the backyard of 3453 Minnesota, finds the gun in the yard, and remains with it for

some time.  *See* Image 5.  Officer Hill does not appear in that back yard until he returns with a Capitol Police officer.  The pair appear to leave the yard as Capitol Police begin to document the scene.





*Images 4 and 5: Still images from Officer Koksaldi's BWC showing Officers Hill and Koksaldi both responding to the tip; Officer Koksaldi finds the firearm first and sits with it*

### c.  Relevant History of the Superior Court Case

The Government summarizes the relevant history of the Superior Court case against Vanterpool relevant to its response.  It is not intended to be a complete description of the case below.

On June 26, 2024, Vanterpool and Brock were indicted in D.C. Superior Court in separate cases.  Generally, Brock and Vanterpool's cases tracked each other, but the Government focuses on Vanterpool's case.  *United States v. Dremale Vanterpool*, 2024CF2006276 (D.C. Super. Ct.); *United States v. Torrance Brock*, 2024CF2006277 (D.C. Super. Ct.).  They were arrested on bench warrants on August 1, 2024 and held without bond.  *See* ECF No. 34-1, Exhibit 1 to Def.'s Motion to Dismiss at 3–4.  Vanterpool's initial counsel filed a motion for bond review on August 21, 2024. *Id.*

Vanterpool got new counsel and Judge Pasichow denied a request to change bond at a September 19, 2024 hearing. *Id.* at 5. Defense counsel did not request a trial date. *Id.* On September 24, 2024, Vanterpool's counsel filed a discovery request that included a request for body-worn camera capturing information related to the incident.

On October 7, 2024, the assigned AUSA disclosed one MPD body-worn camera and one photo from MPD Officer Koksaldi. ECF No. 34-8 (Discovery Letter dated 12/30/24) at 2. That camera and photo had been tagged by the officer with the Brock/Vanterpool CCN, 23091085.

On October 8, 2024, the Court held a status conference. Ex. 6 (Transcript of 10/8/24 Hearing). Defense counsel requested in relevant part the "footage that takes place during the alleged chase." *Id.* at 3–4.[3] The prosecutor—not the assigned AUSA—said in relevant part that "we don't believe that the specific Capitol Police officers that responded that we don't believe that they had BWC at the time," but agreed to check. *Id.* at 5. The Court set a further status conference two days later, on October 10, 2024. *Id.* at 15. Defense agreed to toll speedy trial rights until then. *Id.* at 17.

On October 9, 2024, the government disclosed additional documents related to the case. ECF No. 34-8 at 3. The same day, defense filed another motion for bond review. ECF No. 34-1 at 5.

On October 10, 2024, hearing was held at which the parties continued to discuss the discovery issues. The assigned AUSA stated: "U.S. Capitol Police did not get body-worn camera until May of 2024, so there is no U.S. Capitol Police body-worn camera in this case . . . I did check axon and the body-worn camera that was available under the CCN, I did disclose to counsels. It's

---

[3] There is also discussion about Ocean City police body-worn camera. That is not at issue in Vanterpool's motion.

only one clip of body-worn camera, so I am investigating whether there was previous body-worn camera. I don't have an answer to that yet, but I am investigating that to see if body-worn camera was deleted." ECF No. 34-2 at 4. The Court set trial for December 2, 2024 and an accompanying trial schedule. *Id.* at 12–16.

On October 30, 2024, Vanterpool's defense filed two unrelated motions. ECF No. 34-1 at 6.

On November 1, 2024, Vanterpool's counsel filed motions to compel discovery and for sanction for failure to preserve BWC. *Id.* In the latter motion, Vanterpool's counsel argued that because "the government lost or discarded BWC footage showing the discovery and/or recovery" of the drugs and gun at issue, citing MPD (and Ocean City) BWC, the Court should preclude testimony about the recovery of the drugs and gun." ECF No. 34-3 at 2; *see generally id.* The motion to compel discovery did not specifically address the BWC. Ex. 7 (defendant's Motion to Compel Pretrial Discovery) at 1.

On November 18, 2024, the Superior Court AUSA filed a response to the November 1, 2024 motion for sanctions. Ex. 8 (Government's Opposition to Defendant's Motion for Rule 16 Sanction for Failure to Preserve Body Worn Camera Footage). The motion argued in relevant part, "United States Capitol Police did not start wearing BWC until March of 2024. The Government also disclosed available BWC footage to counsel on October 9, 2024. In conducting a review if any additional BWC exists, no additional BWC was found. Finally, in conducting a search of the CCN to determine whether BWC may have been deleted, it appears no BWC was deleted. It is the Government's understanding that available BWC subject to the governing authorities inclusive of *Brady*, *Jencks*, and Rule 16 have been disclosed." *Id.* at 6.

On November 20, 2024, Judge Pasichow held a trial readiness hearing. Although the government does not have the transcript from that hearing and Vanterpool does not attach it to his brief, the docket reflects that the case was continued to allow the government to turn over all outstanding discovery, and all pending motions would be addressed at the 12/2/24 trial date. ECF No. 34-1 at 6.

On November 23, 2024, Vanterpool's counsel filed a motion to dismiss for a *Brady* violation unrelated to the BWC. ECF No. 34-4 at 10 (inconsistencies between statements based on late disclosure of grand jury transcript); ECF No. 34-8 at 14 (Nov. 22, 2024 disclosure of GJ transcript).

On November 27, 2024, the Superior Court AUSA disclosed that the Officer Hill BWC clip beginning at 7:39 pm (described in Part I.b, *supra*) was deleted on June 13, 2024. ECF No. 34-8 at 3.

On November 30, 2024, Vanterpool's counsel filed a renewed motion for sanctions for admitted destruction of body-worn camera footage, citing, among other things, the Superior Court AUSA's representation in the November 18, 2024 opposition that all BWC disclosures had been made and no BWC had been deleted. Ex. 9 (11/30/24 Renewed Motion for Rule 16 Sanctions for Admitted Destruction of Body Worn Camera Footage).

On December 1, 2024, Vanterpool's counsel filed a motion to dismiss with prejudice for Napue violations from the AUSA's grand jury presentation, relating to the potential inconsistencies (not the BWC).

On December 2, 2024—the scheduled trial date—the Superior Court AUSA disclosed that there was an additional clip from Officer Hill's BWC (beginning 3:00 p.m.) that had been deleted. ECF No. 34-8 at 2. Judge Pasichow admonished the Government for the late disclosure. ECF No.

34-7.  The Superior Court AUSA explained that she had searched by CCN, but her review of the titles of the BWC from that day revealed "two body-worn camera clips that indicate an address that was close to the incident."  *Id.* at 11; *id.* at 13 ("[O]ne thousand clips of body-worn camera that the Government reviewed for titles").  After a brief recess, however the Superior Court AUSA then requested a continuance of the trial date.  At that point, the government had located BWC under the CCN related to the Matthews case.  *Id.* at 41, 61.  Vanterpool's counsel opposed continuance because Vanterpool was held.  *Id.* at 57.  Judge Pasichow strongly admonished the Government, required it to set out discovery in writing, and released the defendants on monitoring and curfew conditions.  *Id.* at 66 ("My issue with . . . the defense's request for dismissal and my requirement that the Government lay this out in paperwork so that we can determine whether there is any endpoint in what seems to be rolling on and on to make it virtually impossible for the defense to represent their clients with due diligence.  My decision at this juncture is not to dismiss the case.  But it is to release the defendants.").  The judge held in abeyance the motion to dismiss.  *Id.* at 67, 102.  Also on December 2, 2024, the Superior Court AUSA disclosed seven additional BWC clips (for a running total of eight MPD BWCs and one photo). ECF No. 34-8 at 3.

The following day, on December 3, 2023, the Superior Court AUSA notified defense about Officer Johnson and Porter's deleted BWC clips, described in Part I.b, *supra*.  ECF No. 34-8 at 3. The Superior Court AUSA also disclosed three additional BWC clips (for a running total of eleven MPD BWCs and one photo).  *Id.*

On December 30, 2024, the Superior Court AUSA also disclosed an additional BWC clip (for a running total of twelve MPD BWCs and one photo).  *Id.*    The same day, the Superior Court AUSA filed an omnibus opposition to defendant's motions to dismiss.  ECF No 34-9.  In relevant part, the Superior Court AUSA describes her process for identifying the BWC:

The Government discovered additional potential BWC clips not by searching the CCN related to the present case, but instead, in review of thousand of files of BWC from the incident date. In reviewing these files, the Government noticed files that were not associated with the CCN in the present case but appeared to have the same address of the arrest location for the defendants. Those additional BWC clips were associated with an entirely different CCN than the present case. The other CCN was connected to an arrest of an individual at the arrest scene. That individual does not appear to be otherwise involved in the present matter.

*Id.* at 11.   The Superior Court AUSA also filed the discovery letter attached as ECF No. 34-8 on the docket on December 31, 2024.

On February 3, 2025, defense filed another motion to dismiss, arguing that the late disclosures of MPD BWC demonstrated the initial Superior AUSA's earlier representations were false and citing to another case the particular AUSA had been involved in.   ECF No. 34-10.   On February 14, 2025, instead of the planned motion hearing, the court held a status conference and scheduled a motion hearing of 6/13/25.   ECF No. 34-1 at 8.   The AUSA responded on February 17, 2025, arguing that the prior statements were not misrepresentations, but instead "new information came to light that the Government then represented to the Court and counsels."   ECF No. 34-11 at 5.

The case was then transferred from Judge Pasichow to Judge Arthur.   An additional motion hearing was set for July 11, 2025.   ECF No. 34-1 at 9.   On May 5, 2025, a status conference was held at which the defendants were taken into custody on the federal warrant in this case.   *Id.*[4]

A new Superior Court AUSA filed a motion to dismiss without prejudice on May 15, 2025. *Id.* at 9.   Vanterpool opposed.   ECF No. 34-12.   On June 13, 2025, the matter was continued "to allow the Court to review the Defendant's Motion and decide the best course of action."   ECF No.

---

[4] Undersigned informed the Superior Court AUSA prior to the May 5, 2025 hearing that the case had been federally charged.   To avoid the risk of flight or danger to the United States Marshals Service, defendants and their counsel were not notified in advance.

34-1 at 9.  On July 11, 2025, the Superior Court AUSA orally amended the Government's motion to dismiss to a motion with prejudice, which Judge Arthur granted.   Ex. 10 (7-11-25 Hearing Transcript) at 13.

### d.  The Instant Case

In January of this year, a new presidential administration took office.  On February 5, 2025, Attorney General Bondi announced a Department of Justice general policy regarding charging, specifically that in the absence of unusual facts, "prosecutors should charge and pursue the most serious, readily provable offense."  *General Policy Regarding Charging, Plea Negotiations, and Sentencing* at 2 (February 5, 2025), available at https://www.justice.gov/ag/media/1388541/dl.  On March 3, 2025, interim D.C. U.S. Attorney Edward Martin Jr. announced a "Make D.C. Safe Again" initiative.  *See, e.g.,* https://x.com/USAEdMartin/status/1897234516764242303 (March 5, 2025).  The initiative directed prosecutors in the U.S. Attorney's Office for the District of Columbia to prioritize federal firearms violations and required the Office's Superior Court Division to review all pending cases for potential federal adoption.  *Id.*  It also directed prosecutors to seek detention, absent Criminal Chief approval, in any criminal case in the District Court in which a federal firearms violation was charged.  *Id.*  Part of the rationale for the initiative was "to crack down on gun violence, prioritize federal firearms violations, pursue tougher penalties for offenses, and seek detention for federal firearms violators." Press Release, U.S. Attorney's Office for the District of Columbia (March 31, 2025), available at https://www.justice.gov/usao-dc/pr/make-dc-safe-again-initiative-gets-fast-start-doubling-monthly-average-january-2021.     Consistent with those directives, Vanterpool and Brock's cases were screened and accepted for federal prosecution pursuant to the initiative.  Upon information and belief, approximately 18 felon-in-possession cases, including Brock and Vanterpool, originally charged in Superior Court were adopted in

Federal Court. In total, for the month of April 2025 (when this case was charged federally), the U.S. Attorney's Office for the District of Columbia brought federal firearms charges under the initiative against 24 defendants. Press Release, U.S. Attorney's Office for the District of Columbia (May 1, 2025), available at https://www.justice.gov/usao-dc/pr/make-dc-safe-again-initiative-continues-build-momentum.[5]

On April 30, 2025, Magistrate Judge Upadhaya issued a complaint, based on the same June 7, 2023 conduct, charging Vanterpool with violations of 18 U.S.C. § 922(g), 21 U.S.C. § 841(a)(1) and (b)(1)(C), and 18 U.S.C. § 924(c)(1)(A)(i), and Brock with violating 18 U.S.C. § 922(g). They were arrested by USMS on May 5, 2025, and brought before Magistrate Judge Harvey the same day. After the Government asked for detention, Magistrate Judge Harvey immediately proceeded to a detention hearing, denied the Government's motion and released both defendants on conditions.[6]

On May 14, 2025, a federal grand jury returned an Indictment against the defendants charging them with identical offenses as in the complaint. ECF No. 15. The Government filed a motion to toll speedy trial on May 15, 2025, which was granted *nunc pro tunc* on May 23, 2025.

---

[5] Several privileges potentially apply to the government's explanation of the initiative's origins and implementation. *See United States v. Zingsheim*, 384 F.3d 867, 871-72 (7th Cir. 2004). In the spirit of resolving Vanterpool's motion to dismiss, the Government waives those privileges but only to the extent they are described in the proffer above.

[6] Counsel for Vanterpool states that "the government, without noting that Mr. Vanterpool was released in Superior Court as a sanction for government conduct, again sought Mr. Vanterpool's detention on the charges stemming from the June 7, 2023 arrest." ECF No. 34 at 5. The transcript from that hearing is not available to the Government. However, undersigned agreed on the record with Judge Harvey during the detention hearing that Vanterpool and Brock had been released from detention below due to an apparent discovery violation. It is difficult to see how counsel could have raised the issue with the Court sooner, given that the request for detention and detention hearing took place the very same afternoon.

ECF Nos. 17, 19.  Defendants were arraigned on May 23, 2025, and Speedy Trial Act time was excluded through June 2, 2025.

On May 30, 2025, Vanterpool moved unopposed to continue the status hearing set for June 5, 2025, which was reset to June 18, 2025 and the Speedy Trial Act clock remained tolled by agreement of the parties.  ECF No. 21; Min entry 6/4/25, 6/9/25.

At the June 18, 2025 status hearing, the Government requested a continuance in order to obtain and review materials from Ocean City, Maryland.  The Court granted the continuance and, on the defendants' consent, excluded Speedy trial Act time between then and August 12, 2025. Minute Entry 6/18/25.    The bulk of the Ocean City materials were provided on August 9, 2025.

At the August 12, 2025 status hearing, the Government requested an additional short continuance to provide defendants the full images of their client's phones[7] and to extend plea offers.  Each defendant requested a schedule for motions (the Government's Rule 404(b) for Brock, a motion to dismiss and sever for Vanterpool).  The Court denied the Government's continuance request, set a motions schedule and, with the defendants' consent, tolled Speedy Trial Act until September 5, 2025. Min Entry 8/12/25.

## II.   <u>ARGUMENT</u>

Defendant asks for "extraordinary relief," *United States v. Morrison*, 449 U.S. 361, 363 (1981), contending his Indictment must be dismissed with prejudice because (1) the delays in Superior Court deprived Vanterpool of his constitutional right to a Speedy Trial; (2) the government's failure to retain five MPD body-worn camera clips violates Due Process; (3) the

---

[7] The Government had received a hard drive from Ocean City at the end of June 2025 and confirmed which phones it contained in mid-August 2025.

decision to prosecute Vanterpool in federal court was vindictive; and (4) the Court should use its supervisory powers to dismiss the case.  None have merit.

### a.  Vanterpool's Constitutional Speedy Trial Rights Are Not Violated

Vanterpool argues that the late disclosure of evidence in Superior Court and the decision to charge him federally violates his constitutional right to a speedy trial under the Sixth Amendment.  ECF No. 34 at 7–8.  Vanterpool does not claim a Speedy Trial Act violation under 18 U.S.C. § 3161.

Unlike its statutory counterpart, the constitutional speedy-trial right "is amorphous, slippery, and necessarily relative.  It is consistent with delays and dependent upon circumstances." *Vermont v. Brillon,* 556 U.S. 81, 89 (2009) (citations, internal quotation marks, and brackets omitted).  Although "[t]he absence of a Speedy Trial Act violation does not *ipso facto* defeat a Sixth Amendment speedy trial claim," it is an "unusual case" in which the Act is followed but the Constitution is violated. *United States v. Rice,* 746 F.3d 1074, 1081 (D.C.Cir. 2014).  In order to determine whether a defendant's Sixth Amendment right has been violated, the Court must consider: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo,* 407 U.S. 514, 530 (1972).

Turning to the first *Barker* factor,[8] the defendant must make a showing that the delay between the accusation and the trial was presumptively prejudicial in order for the claim to

---

[8] Vanterpool assumes, without analysis, that the Superior Court indictment triggered his Sixth Amendment right.  In *United States v. Mills,* the D.C. Circuit, *en banc,* held that Superior Court charges did not trigger the 30-day federal statutory clock between arrest and indictment– "only an arrest in connection with federal charges triggers § 3161(b) of the Speedy Trial Act."  964 F.2d 1186, 1193 (D.C. Cir. 1992).  Under the Sixth Amendment, "an arrest or indictment by one sovereign would not cause the speedy trial guarantees to become engaged as to possible subsequent indictments by another sovereign." *United States v. MacDonald*, 456 U.S. 1, 10 n.11 (1982).  In rejecting an argument that the Speedy Trial Act should be read the same way as the Sixth Amendment, *Mills* recognized that, unlike traditional divisions between state and federal

proceed.  *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) ("'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry.").  The roughly fourteen-month delay since the June 2024 indictment is just over the one-year mark the Supreme Court has found presumptively prejudicial.  "[T]he presumption that pretrial delay has prejudiced the accused intensifies over time." *United States v. Taylor*, 497 F.3d 673, 677 (D.C. Cir. 2007) (quotations omitted).  "[B]ecause the delay [here] only just exceeded that bare minimum, the presumption has not 'intensifie[d]' at all." *Id.*  In short, this factor only slightly favors the defense.

Contrary to Vanterpool's claim (ECF No. 34 at 8), the delays in this case are attributable to both the defense and the government.  Based on the Superior Court docket, Vanterpool failed to appear at his June 26, 2024 felony arraignment date, and so a bench warrant was issued that was not returned until August 1, 2024.  Between August 1 and November 1, 2024, Vanterpool's counsel filed numerous motions, including bond review, and the case proceeded on a trial track as the Superior Court AUSA indicated she was looking into the BWC issues.  The Government concedes that the period between defendant's first motion on this BWC issue, November 1, 2024 through the scheduled trial date (December 2, 2024) to February 3, 2025 are attributable to the

---

sovereigns, the U.S. Attorney for the District of Columbia had "unified sovereignty . . . [which] affords defendants here advantages not shared by state defendants.  964 F.2d at 1193.  It stated in dicta that "a District arrest will more often start the running of Sixth Amendment speedy trial rights than a similar state arrest." *Id.; see also id.* at 1200 (Sentelle, J., dissenting) ("Our colleagues point to the fact that Sixth Amendment speedy trial rights apparently begin running from the moment the accused is arrested in the District, but do not when he is arrested by a state and later tried in a federal court").  In the earlier panel decision, the Circuit had expressly remanded for the court to consider that question, which the *en banc* panel did not disturb. *See United States v. Mills*, 925 F.2d 455, 465 (D.C. Cir.), *vacated on other grounds* 933 F.2d 1042 (D.C. Cir. 1991), and *on reh'g,* 964 F.2d 1186 (D.C. Cir. 1992).  Nonetheless, for purposes of this motion, the Government will assume that the Sixth Amendment is triggered by arrest in connection with Superior Court charges.

Government's failure to provide BWC.  However, on February 3, 2025, Vanterpool's counsel filed yet another motion to dismiss, and a few days later the scheduled motions hearing was replaced with a status conference and pushed until June 2025.   As of May 5, 2025, the parties were still litigating unresolved motions to dismiss—indeed, defense counsel would delay dismissal of the case in order to litigate the same issues.  *United States v. Gerald*, 5 F.3d 563, 566 (D.C. Cir. 1993) ("Several months of that delay were attributable to the consideration of Gerald's pretrial motions (in fact, he moved for an extension of time within which to file them)").

Similarly, since this case began in federal court in May 2025, the delay has been attributable to both parties.  The Government has produced over 800 files to the defense and requested two short continuances to address discovery issues.  Defense, for its part, moved to continue an early June status hearing and, at an August 12, 2025 status hearing, requested a motions schedule.  In short, the delay is due to both parties, and so this factor is neutral at best.

The third factor—defendant's assertion of his right—should doom this claim.  <u>At no point</u> in the Superior Court case or the federal court case has defendant Vanterpool ever made a speedy trial claim, whether cloaked as either a statutory or constitutional right.  In fact, defense has repeatedly <u>agreed</u> to the tolling of the Speedy Trial Act in this case.  Dkt. Entry dated 5/5/25, 5/23/25, 6/18/25, 8/12/25.  As noted above, defendant Vanterpool moved to push back one of the status conferences and requested a pre-trial omnibus motion schedule on a grab-bag of issues – far from an assertion of his right to speedy trial.

Finally, defense identifies <u>no</u> prejudice that attaches to the continued prosecution of this case.  *See Gerald*, 5 F.3d at 566 (same).  This is especially so where defendant has—over the Government's objection, admittedly—been out on pretrial release since December 2024.  Further,

the officer-dependent nature of the case means that any dimmed witness memories, for example, would prejudice the government, not the defense.

In short, two of four *Barker* factors completely favor the Government, one is neutral, and one barely favors the defense. This is thus not the "unusual case" where the Court should reach to find a constitutional violation where there has been no colorable claim that Vanterpool's Speedy Trial Act rights have been violated. *Rice*, 746 F.3d at 1081.

**b.** **<u>The Deleted BWC Does Not Rise to a Due Process or Rule 16 Violation And Certainly Does not Merit Dismissal</u>**

Vanterpool seems to argue that the Government's failure to preserve the five deleted MPD BWC clips violated both the Due Process Clause of the Fifth Amendment and Federal Rule of Criminal Procedure 16(a)(1)(E). ECF No. 34 at 9–11. Because Vanterpool has not made the relevant showing of bad faith or materiality, neither claim is correct. In any event, adverse jury instructions—not the "draconian remedy" of dismissal of the Indictment with prejudice, *United States v. Jones*, 524 F.2d 834, 852 (D.C. Cir. 1975)—would be the appropriate sanction.

**i.  Due Process Clause**

"To make out a claim that the destruction of evidence violated the Due Process Clause, 'the defendant bears the burden of proving that the government failed in bad faith to preserve material and potentially exculpatory evidence.'" *United States v. Burnett*, 827 F.3d 1108, 1116 (D.C. Cir. 2016) (citing *United States v. McKie*, 951 F.2d 399, 403 (D.C. Cir. 1991)); *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*.

Here, Vanterpool does not actually assert that these five videos were destroyed in bad faith. In fact, the evidence indicates the opposite is true. *See United States v. Green*, No. CR 19-19

21

(RDM), 2021 WL 5043089, at *3 (D.D.C. Oct. 29, 2021). "The files at issue were deleted pursuant to standard procedure, and the government has submitted evidence showing that no one from the MPD or from the U.S. Attorney's Office even accessed the body-worn camera footage before those files were deleted." *Id.* (rejecting Due Process claim for failing to preserve MPD BWC from an earlier encounter). Based on the audit trails, all five videos were set for a retention policy of one year based on the officer (incorrectly) tagging the 'category' indicating that no arrest had taken place. Exs. 1-5. All five videos were automatically deleted by the system after that period lapsed. *Id.* And nobody from the U.S. Attorney's Office accessed those files at any time prior to their deletion. *Id; Green*, 2021 WL 5043089, at *3 ("The files at issue were deleted pursuant to standard procedure, and the government has submitted evidence showing that no one from the MPD or from the U.S. Attorney's Office even accessed the body-worn camera footage before those files were deleted.").

If anything, the Government had every incentive to preserve those videos or at least no incentive to destroy them. Three of the five BWC (Porter's BWC beginning at 3:10pm and Hill's BWC beginning at 3:00 pm and 7:39pm) would have captured some of the post-chase interactions; the other two videos either pre- or post-date the incident. *See Green*, No. CR 19-19 (RDM), 2021 WL 5043089, at *3 ("it was more likely that the evidence would have been useful to the police— who were still conducting an investigation—and to the prosecutor—who would later bear the burden of establishing guilt beyond a reasonable doubt—than to the defendant."). Finally, there is no indication anyone had "knowledge of [any] exculpatory value" that these five videos might have had, *Youngblood*, 488 U.S. at 56 n.* (majority opinion), as the Superior Court grand jury did not return the indictment in this case until over a year after the incident. *Cf. Green*, 2021 WL

5043089, at *3 ("it was not until January 2019—nearly two years later—that a grand jury returned the initial indictment in this case").

In sum, Vanterpool has not shown that the government failed in bad faith to preserve the five BWC from June 7, 2023, and so his Due Process rights are not violated.

### ii. Rule 16(a)(1)(E)(i)

Under Fed. R. Crim. 16(a)(1)(E)(i), the government must disclose evidence that is "material to preparing the defense."[9] Rule 16 imposes a duty to preserve material evidence in the Government's possession even before a case is filed. *United States v. Bryant*, 439 F.2d 642, 651 (D.C. Cir. 1971); *United States v. Vega*, 826 F.3d 514, 533 (D.C. Cir. 2016) (recognizing *Bryant's* overruling on Due Process claims); *United States v. Taylor*, 312 F. Supp. 3d 170, 181 (D.D.C. 2018) (the Circuit has never "disavowed the Rule 16 analysis contained in *Bryant.*"). Evidence is material "as long as there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993) (internal quotation marks and citation omitted). "The district court has wide discretion in imposing a sanction if it finds that Rule 16 has been violated." *United States v. Marshall*, 132 F.3d 63, 69 (D.C. Cir. 1998); *see* Fed. R. Crim. 16(d)(2) (court "may prohibit that party from introducing the undisclosed evidence" or "enter any other order that is just under the circumstances.")

Vanterpool has not even tried to show why the five MPD deleted body-worn clips are material. The crux of this case centers around the U.S. Capitol Police pursuit of the defendants in the Nissan Rogue and then on foot, which is not captured on *any* body-worn camera. Officers'

---

[9] The Government does not dispute that the MPD BWC were in its possession, custody, and control, or that it failed to take steps to preserve them.

subsequent efforts at the scene—and the discovery of the firearms and drugs—is indisputably relevant. However, the Government has disclosed twelve MPD BWC/videos that do capture those efforts as well as relevant statements by the USCP officers, and over 300 photos documenting the crime scene. *See United States v. Evans*, No. 22-CR-63 (RCL), 2022 WL 16758553, at *5 (D.D.C. Nov. 8, 2022) (finding no Rule 16 violation in failing to retain possession of SUV in kidnapping case where "[t]he government has provided the defense at least 74 photographs of the vehicle as well as expert reports on blood spatter analysis, firearms, and trajectory"). This is a "substantial and meaningful production." *Id.* (quoting *United States v. Slough*, 22 F. Supp. 3d 1, 6 (D.D.C. 2014)). From the disclosed evidence, it is not clear that the five BWC clips would lead to admissible evidence, witnesses, corroborating testimony, or otherwise assist any impeachment. Officer Johnson's deleted video ends at approximately 2:36 p.m., around 14 minutes before U.S. Capitol Police responded to the license plate hit. Officer Hill's 4:21 p.m. BWC is titled "20230607- TRAFFIC- 3900 MINNESOTA AVENUE NORTHEAST" (.7 miles away from the offense address) and category is tagged as a traffic stop. *United States v. Harris*, No. CR 20-108 (RC), 2021 WL 1546541, at *3 (D.D.C. Apr. 20, 2021) (finding no Rule 16 violation in firearms case where "it simply is not clear that any DNA evidence on the firearm, which was recovered from Mr. Harris's pocket" would be material). And defense does not spell out what it might seek to develop from the other three BWC clips that it cannot from those same officers (Hill and Porter) being captured on Officer Johnson's, Wershbale's, and Koksaldi's disclosed BWCs, respectively.

Even if the Court agrees, however, that a Rule 16 violation has occurred here through the Government's failure to preserve these five videos, the severe sanction of dismissal is not the appropriate remedy. *See Marshall*, 132 F.3d at 69 ("A trial judge should impose the least severe sanction that will accomplish the desired result—prompt and full compliance with the court's

discovery orders.") (citation and quotation marks omitted).  Vanterpool argues that dismissal is the only remedy, but he does not address the availability of lesser sanctions—such as precluding these witnesses from testifying or an adverse jury instruction, such as Redbook 2.300.  *See, e.g., United States v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) ("A 'spoliation' instruction, allowing an adverse inference, is commonly appropriate in both civil and criminal cases where there is evidence from which a reasonable jury might conclude that evidence favorable to one side was destroyed by the other. . . . The burden is upon the party seeking the instruction to establish such evidence.") (citation omitted)).  Indeed, although bad faith is not always required, this Circuit has cautioned that even a "severe" sanction like "suppressing evidence as a result of the government's discovery violation . . . would seldom be appropriate where—as here—the trial court finds that the government's violation did not result from its bad faith and that a less drastic remedy (such as a continuance) will mitigate any unfair prejudice."  *Marshall*, 132 F.3d at 70; *see also id.* (considering whether a sanction "ruling would have subverted one of Rule 16's goals: 'contributing to an accurate determination of the issue of guilt or innocence.'").  There is no evidence of bad faith for the destruction here, and any remote prejudice to the defense can be mitigated via jury instruction should the Court find a Rule 16 violation.

### c.  <u>Vanterpool Does Not Demonstrate Vindictive Prosecution</u>

Vanterpool argues the indictment should be dismissed because the decision to bring charges in federal court was based on the exercise of his constitutional and statutory rights in Superior Court.  ECF No. 34 at 12.  Because his case was adopted as part of a broader initiative to more severely punish gun defendants by charging them in federal court, his vindictiveness claim fails.

"The Due Process Clause prohibits prosecutors from 'upping the ante' by filing increased charges in order to retaliate against a defendant for exercising a legal right." *United States v.*

*Slatten*, 865 F.3d 767, 798-99 (D.C. Cir. 2017) (citation omitted). Because prosecutors have "'broad discretion to enforce the law,'" however, to succeed on a claim of vindictive prosecution, Vanterpool must establish that any "increased charge was 'brought *solely* to penalize' [him] and could not be justified as a proper exercise of prosecutorial discretion." *Id.* (citation omitted). A defendant may prove prosecutorial vindictiveness by submitting either "(i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient to establish a realistic likelihood of vindictiveness, thereby raising a presumption the Government must rebut with objective evidence justifying its action." *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011) (citation cleaned up).

Vanterpool has not tried to show "actual vindictiveness," which "requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights" and "is normally exceedingly difficult to make." *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002) (quoting *Maddox v. Elzie,* 238 F.3d 437, 446 (D.C. Cir. 2001)). Instead, Vanterpool asks this Court to presume vindictiveness. It should decline. "To invoke the presumption of vindictiveness, [the court] must find that a reasonable likelihood of vindictiveness exists—that is, that the second indictment was 'more likely than not attributable to the vindictiveness on the part of' the [g]overnment." *Id.* (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989)). A pretrial decision "to modify the charges" alone will not raise such a presumption because a prosecutor must "remain free before trial" to determine "the extent of the societal interest" in a given prosecution. *United States v. Goodwin*, 457 U.S. 368, 381–382 (1982). "The routine exercise of many pre-trial rights also weakens any inference of vindictiveness, *i.e.*, that a prosecutor would retaliate simply because a defendant sought a jury trial or pleaded an affirmative defense." *Slatten*, 865 F.3d at 799. "Where the defendant provides evidence sufficient

to support a presumption of vindictiveness, the burden shifts to the government to produce 'objective evidence' that its motivation in charging the defendant was lawful." *United States v. Meadows*, 867 F.3d 1305, 1312 (D.C. Cir. 2017) (quoting *Safavian*, 649 F.3d at 694). "That burden is 'admittedly minimal—any objective evidence justifying the prosecutor's actions will suffice.'" *Id.* (quoting *Safavian*, 649 F.3d at 694). If the government can produce objective evidence that its motive in prosecuting the defendant was not vindictive, then "the defendant's only hope is to prove that the justification is pretextual and that actual vindictiveness has occurred." *United States v. Meyer*, 810 F.2d 1242, 1243 (D.C. Cir.), *reh'g en banc granted, opinion vacated*, 816 F.2d 695 (D.C. Cir. 1987), and *opinion reinstated on reconsideration sub nom. Bartlett on Behalf of Neuman v. Bowen*, 824 F.2d 1240 (D.C. Cir. 1987).

Vanterpool's conjecture that "the government only move[d] the case to federal court in response to the threat of sanctions in Superior Court based on Mr. Vanterpool's exercise of his constitutional and statutory rights" does not give rise to a presumption of vindictiveness. ECF No. 34 at 13. First, Vanterpool's does not clearly explain what "constitutional [or] statutory" right the government sought to punish by bringing the case in federal court—as is clear from expansive pretrial litigation in this case, the defense sought sanctions on numerous occasions in Superior Court; the judge had already released him; and his motions to dismiss were still pending. *See Gerald*, 5 F.3d 563, 566 ("Gerald has failed to identify any legal right whose exercise the Government sought to penalize by transferring his case to federal jurisdiction"). Second and more fatally, Vanterpool omits relevant context. Following his release in Superior Court on December 2, 2024, but before his April 30, 2025 federal charges, the Office adopted new protocols involving gun cases like Vanterpool's. This new gun initiative began on March 3, 2025, and is a "consistent and nonretaliatory" explanation for Vanterpool's federal charges. *See Gerald*, 5 F.3d at 566

(rejecting vindictiveness claim that Government's transfer of his case to federal court was improper because it was made for the purpose of taking advantage of the higher penalties available under the U.S. Sentencing Guidelines). Vanterpool's vindictiveness argument ultimately boils down to timing—that the charges followed his release. But "proof of a prosecutorial decision to increase charges after a defendant has exercised a legal right does not alone give rise to a presumption [of vindictiveness] in the pretrial context" because "this sequence of events, taken by itself, does not present a 'realistic likelihood of vindictiveness.'" *Meyer*, 810 F.2d at 1246; *see also United States v. Simmons*, No. CR 18-344 (EGS), 2022 WL 1302888, at *17 (D.D.C. May 2, 2022) (rejecting timing claim under previous USAO initiative).[10]

In any event, there is ample "objective evidence" demonstrating a nonretaliatory motive for charging Vanterpool in federal court. *Safavian*, 649 F.3d at 692. Earlier this year, as part of the incoming Presidential administration, Attorney General Bondi announced stringent charging policies for the Department. In March 2025, then-interim U.S. Attorney Edward Martin Jr.

---

[10] The D.C. Circuit opinion in *Meyer* that Vanterpool relies (ECF No. 34 at 12–13) on is distinguishable. There, the Government had prosecuted about approximately 200 people, and offered them two options: (1) plead guilty and pay a $50 fine, or (2) proceed to trial and face a $500 penalty and up to six months' imprisonment. 810 F.2d at 1243–44. The Circuit affirmed the district court's dismissal the charges of those who went to trial, finding the "most important" factor for vindictiveness was "the government's disparate treatment of the defendants who elected to go to trial and the defendants who elected to forego their trial rights." The Circuit also found that "[t]he simplicity and clarity of both the facts and law underlying [the] prosecutions;" the government's effort "to drop the charge that it had so recently added to each information" at "the very beginning of the hearing on prosecutorial vindictiveness," and the government's interest in avoiding "the annoyance and expense of prosecuting these minor cases at a potentially drawn-out trial" involving thirty-six defendants all weighed in favor of a presumption of vindictiveness. *Id.* at 1247. Here, however, Vanterpool does not point to any disparate treatment, nefarious post-federal-charging conduct, or effort to avoid trial; moreover, although the facts is fairly simple, the Superior Court case history in which the disclosure issues were litigated is quite winding and muddled. *Id.* ("officials often make charging decisions before analyzing thoroughly a case's legal complexities,"). All of these facts point against a presumption of vindictiveness here.

instituted an office-wide gun initiative called "Make D.C. Safe Again." Under it, existing Superior Court firearms cases were screened for adoption into federal court, in part to "pursue tougher penalties for offenses." Part of the initiative also required prosecutors to seek detention in federal court, absent exception. Vanterpool and Brock's cases were initiated in federal court pursuant to that initiative, along with 16 other Superior Court cases. Indeed, in the month of April alone, 24 defendants were charged under the new initiative. This is a "consistent and nonretaliatory explanation" for the Government's charging decision. *United States v. Mills*, 925 F.2d 455 (D.C. Cir. 1991), *rev'd on other grounds in* 964 F.2d 1186 (D.C. Cir. 1992).

This case is on all fours with *Mills*, 925 F.2d 455. There, the Circuit considered the claims of three defendants who "were initially charged in [D.C.] Superior Court, but those charges were later dropped in favor of a subsequent prosecution in federal court for the same criminal conduct, effectively 'transferring' the cases from one court system to the other." *Mills*, 925 F.2d at 226. The transfers took place pursuant to an "initiative to crack down on drug-related crime in the nation's capital" that had been announced by "high-ranking officials in the Bush administration" to "take advantage of the stricter penalties available under the federal sentencing guidelines." *Id.* The D.C. Circuit noted that the lower court had found that, "[i]n case after case, the particular defendant whose case was transferred had declined to plead guilty in Superior Court prior to his indictment in this Court. Indeed, in several instances, the relationship between the refusal to enter a guilty plea and indictment in federal court was explicitly spelled out." *Mills*, 925 F.2d at 463. However, despite these "circumstantial findings," the court concluded that there was otherwise "no basis for finding that the transfer decisions were undertaken somehow to *penalize* the appellees for the exercise of their constitutional rights in D.C. Superior Court." *Id.* at 232. Rather, the record reflected that the cases had been transferred upon the prosecutors' reassessment of "the societal

29

interest in prosecution" and the government had provided a "consistent and nonretaliatory explanation" for its decisions. *Id.* at 233.

In a short, Vanterpool does not raise a presumption of vindictiveness here. Even if he had, the Government has met its burden to put forward minimal objective evidence that the decision to charge him was nonretaliatory.

### d.  **Supervisory Authority is an Extreme Remedy**

Vanterpool argues that this Court should exercise its supervisory authority to dismiss the case entirely because of the Government's failure to preserve evidence, misrepresentations about the existence of BWC, its decision to move charges to federal court, and dismissal of the case with prejudice. ECF No. 34 at 14.

A court may dismiss an indictment based upon its inherent authority only if the Government engaged in misconduct, the defendant was prejudiced, and no less severe remedy was available to address the prejudice. See *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-56, 263 (1988); *United States v. Chapman*, 524 F.3d 1073, 1087 (9th Cir. 2008) (stating that "[a] court may dismiss an indictment under its supervisory powers only when the defendant suffers substantial prejudice and where no lesser remedial action is available"). "The supervisory power doctrine is an extraordinary one which should be 'sparingly exercised.'" *United States v. Jones*, 433 F.2d 1176, 1181–82 (D.C. Cir. 1970). "[D]ismissal of an indictment with prejudice is the most severe sanction possible. Such dismissal exercised under the guise of 'supervisory power' is impermissible absent a clear basis in fact and law for doing so." *United States v. Slough*, 679 F. Supp. 2d 55, 61 (D.D.C. 2010) (quoting *United States v. Isgro*, 974 F.2d 1091, 1097 (9th Cir.1992). In the context of prosecutorial decisions, "the federal judiciary's supervisory powers over

prosecutorial activities that take place outside the courthouse is extremely limited, if it exists at all." *United States v. Lau Tung Lam*, 714 F.2d 209, 210 (2d Cir. 1983).

There is no question that the Superior Court AUSA's statements about the existence of BWC to the Court were incorrect, and that as a result, Vanterpool's December 2, 2024 trial was delayed, or that the Government failed to preserve five potentially relevant BWCs. However, there is no evidence that those misstatements or deletions were intentional or malicious. And as described above, the decision to charge Vanterpool in federal court stemmed from the USAO's office-wide federal court gun push, not the facts of Vanterpool's Superior Court case. The Superior Court has also taken steps to remedy the late BWC disclosure by releasing Vanterpool and Brock, and Vanterpool has not otherwise shown how the deleted BWC prejudiced his defense. *United States v. Derrick*, 163 F.3d 799, 808 (4th Cir. 1998) (collecting cases requiring showing of prejudice to support dismissal). In sum, any alleged misconduct or prejudice to Vanterpool here fall far short of the extreme remedy of dismissal. See *United States v. Darui*, 614 F. Supp. 2d 25 (D.D.C. 2009) (dismissal could hypothetically be appropriate in extreme circumstances, but it also noted that even perjury by a government witness of which the prosecution was aware had previously been held to justify only a new trial, not dismissal); *Derrick*, 163 F.3d at 809 (any prejudice that arguably existed as a consequence of discovery violations is fully remedied by this court's orders of new trials).

The three cases cited by the defense are all inapplicable because they involved Rule 48 dismissals by the Government, not a court's use of its supervisory authority to dismiss a case on the defendant's motion. ECF No. 34 at 15; *see also United States v. Evans*, No. 22-CR-63 (RCL), 2022 WL 16758553, at *6 (D.D.C. Nov. 8, 2022) ("Mr. Evans does not cite any authority for the proposition that where, as here, one court denies the local equivalent of a Rule 48(a) motion and

declines to dismiss the first indictment without prejudice, another court is then *required* to exercise its supervisory power to dismiss the second indictment with prejudice.").  In *United States v. Pitts*, the Government charged Pitts first in Superior Court and then in federal Court for identical gun and drug-related conduct. 331 F.R.D. 199, 200 (D.D.C. 2019).  After some initial discovery missteps, the Government then moved to dismiss the case without prejudice under Rule 48(a) so it could test the firearm without violating Pitts' speedy trial rights. *Id.* at 205.  Judge Sullivan reasoned that allowing the government to bring the case a third time would amount to harassment and so required dismissal with prejudice.  *Id.* at 204. He also found concerning dual (and possibly three) arrests for the same conduct.  *Id.* at 205.  Here, however, there is no pending Rule 48 motion to dismiss, let alone one seeking for a third bite at the apple, and the deleted BWC has <u>no</u> bearing on the strength of the government's case against the defendant.

Similarly, in *Poindexter*, the court ruled on a government motion to dismiss under Rule 48 two charges on the rationale ongoing Iran-Contra investigation could lead the prosecutor to put forward the best case against the defendant at a later date.  *United States v. Poindexter*, 719 F. Supp. 6, 12 (D.D.C. 1989).  However, the court concluded that allowing the defendant to wait in a state of uncertainty would not be fair, and so ordered the counts dismissed with prejudice.  *Id.* Again, that case involved the Government's motion to dismiss in the same case under Rule 48— which permits a court role—not a defendant asking the Court exercise its supervisory authority to dismiss.

And in *Borges*, this Court confronted the issue of the misconduct of an FBI agent who was left unmonitored with evidence.  *United States v. Borges,* 153 F. Supp. 3d 216, 219 (D.D.C. 2015). The Government moved to dismiss under Rule 48, and "the only remaining question to be resolved was whether the case should be dismissed with, or without, prejudice."  *Borges*, 153 F. Supp. 3d

216, 219 (D.D.C. 2015). There, the Government hoped the agent might be available to testify at some later date, such as if he pled guilty to his conduct. *Id.* at 220. This Court reasoned that "[u]nder the unique circumstances of this case it would, by any objective standard, be harassing to these defendants to leave the threat of reprosecution hanging over their heads," and so dismissed the case with prejudice. *Id.* at 221. Again, here this is not a Rule 48(a) dismissal for which uncertain future prosecution will remain a threat. Moreover, defendant's claimed evidentiary deficiencies do not permeate the entirety of the Government's case, as it did in *Borges*.

Vanterpool's reliance on the July 11, 2025 Superior Court dismissal with prejudice as a reason to dismiss here misstates the record. As noted above, the Superior Court AUSA moved to dismiss on May 15, 2025 without prejudice. Vanterpool's Superior Court counsel opposed that motion, arguing it should be dismissed with prejudice for the same reasons of prosecutorial misconduct. That motion was not decided until July 11, 2025—two months into this federal case. At the July 11 hearing, Judge Arthur recognized that Judge Pasichow had expressly reserved ruling on the motion for prosecutorial conduct and repeatedly acknowledged the prosecutorial misconduct issues could be litigated "across the street." Ex. 10 at 8. At the Court's suggestion, the Government moved to orally amend its motion to dismiss with prejudice, as opposed to agreeing to defendant's motion, so the case could proceed in federal court *without* conceding the misconduct claims. *Id.* at 11, 13. Accordingly, Vanterpool's argument that the government "strategically agreed to dismissal with prejudice" to "avoid[] any specific findings" contradicts the record, because the parties expressly contemplated these issues would be litigated in District Court – the subject of this very motion. ECF No. 34 at 15. And to the extent Vanterpool is arguing that the Superior Court dismissal before trial or evidence somehow has preclusive effect here, he is wrong as a matter of law. *See Evans*, No. 22-CR-63 (RCL), 2022 WL 16758553, at *7 ("No jury had

been sworn nor had any evidence been presented in Mr. Evans's case in D.C. Superior Court, therefore jeopardy had not attached when Judge Raffinan made her ruling. . . .  Because jeopardy had not attached, this Court will follow the long-established practice of declining to apply collateral estoppel in a criminal case absent a jeopardy attachment.").  The Superior Court dismissal with prejudice did just that—it appropriately barred re-prosecution in Superior Court following a federal indictment.

In sum, exercise of this Court's supervisory authority is an extraordinary remedy not warranted by these facts.  Moreover, the Court should not permit Vanterpool to bootstrap his own version of the dismissal below to throw out an earlier federal grand jury indictment.

## III.    **CONCLUSION**

Because (1) the delays in Superior Court do not rise to a constitutional speedy trial violation; (2) the deletion of 5 body-worn cameras do not violate Due Process, Rule 16, or justify dismissal in any event; (3) he has not shown vindictiveness; and (4) the Court's supervisory powers are not warranted here, the Court should deny Vanterpool's motion.  ECF No. 34.

Respectfully,


JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By:    */s/ Michael L. Barclay*
MICHAEL L. BARCLAY
Assistant United States Attorney
N.Y. Bar Reg. No. 5441423
601 D Street, N.W., 5.230
Washington, D.C. 20530
(202) 252-7669
michael.barclay@usdoj.gov